IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| KAREN THORNDYKE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JO ANNE B. BARNHART, )<br>Commissioner of Social Security, )<br>)<br>Defendant. ) | Case No. 05-4128-CV-C-ODS |

### ORDER AND OPINION AFFIRMING
### COMMISSIONER'S FINAL DECISION DENYING BENEFITS

Pending is Plaintiff's request for review of the final decision of the Commissioner of Social Security denying her application for disability and supplemental security income benefits . The Commissioner's decision is affirmed.

### I. BACKGROUND

Plaintiff was born in June 1969 and has earned her G.E.D. She has prior work experience as stocker, cashier, retail clerk and janitor, but alleges she became disabled effective on November 21, 2001, due to bipolar disorder and back pain. At best, scant details have been provided about Plaintiff's back (in fact, she did not mention it during her testimony before the ALJ), so the ALJ and the parties have focused exclusively on Plaintiff's mental condition.[1] The Court will follow suit.

Plaintiff was involuntarily admitted to the Mid-Missouri Mental Health Center in June 1998 because she reported thoughts of suicide. She told the doctor treating her (Dr. Kurt Guindon) that she had recently resumed taking Xanax after successfully

---

[1]The only evidence regarding Plaintiff's back problems appears in a consultative examination performed in January 2003. At that time, Plaintiff reported her back was "not bothering me much" and testing failed to demonstrate any limitations on Plaintiff's functional abilities. R. at 181-82.

breaking her addiction in October 1997. She also reported smoking marijuana every other day. Blood tests confirmed Plaintiff's marijuana use; however, they indicated Plaintiff had been taking Xanax despite her claim that she was no longer doing so. Dr. Guindon diagnosed Plaintiff as suffering from bipolar disorder and Xanax withdrawal and reported she responded well to anti-depressant medication. She was discharged after one week.

During a well-woman exam in March 2001, Plaintiff reported to Dr. Jean Hertz that she felt depressed and anxious. She denied having suicidal thoughts, but stated the medications she had used were not helpful. Although she told Dr. Hertz about her problems with Xanax, she did not report her marijuana use. R. at 221, 228. Dr. Hertz prescribed Serzone (an anti-depressant) and Elavil (to help Plaintiff sleep) and arranged for a consultation with a psychiatrist for medication management. R. at 221. There are no records from the psychiatrist, nor are there any additional records from Dr. Hertz.

In January 2002, Plaintiff went to the University Hospital at the University of Missouri seeking help. Plaintiff was examined by Doctor Xiangyang Shi. Plaintiff reported feeling stressed and anxious. She told Dr. Shi she had been prescribed anti-anxiety medication on several occasions in the past for no longer than two months at a time, but had not been on medication since 1999. She told Dr. Shi she had smoked marijuana within the last three weeks, but did not tell Dr. Shi about her problems with Xanax or about her successful treatment with anti-depressants (as opposed to anti-anxiety medication such as Xanax). Dr. Shi diagnosed Plaintiff as suffering from bipolar disorder and anxiety disorder, assessed her GAF score at 60, and prescribed Xanax to treat Plaintiff's anxiety and panic attacks. During a follow up on February 19, 2002, Plaintiff reported that her mood swings, panic attacks and mood swings had decreased and she was sleeping well. Her medications were continued. R. at 200-02. Plaintiff reported continued improvement on April 9. R. at 198. On May 14, Plaintiff reported "angry feelings toward the person who abused her daughter" and "relationship problems" with her husband, but denied feeling depressed or irritable. She also reported "few" panic attacks. Plaintiff's medications were increased. R. at 195.

2

Plaintiff missed her next three appointments, but returned on June 10, 2002. She reported "doing relatively normal" and experiencing less irritability. Plaintiff was getting eight to ten hours of sleep a night with no insomnia and reported a wide range of activities including camping, going to amusement parks, and other family activities. R. at 190. Plaintiff missed her next two appointments, but returned on July 16 and August 27. She denied having any difficulties and her medications were continued. R. at 186-87.

On October 29, 2002, Plaintiff told the doctor she was going to Wisconsin to visit her sick mother-in-law. She was anxious, and attributed this feeling to the stress surrounding her mother-in-law's illness. Her Xanax was increased, but no other changes in her treatment were made. R. at 185. Five days later, Plaintiff filed her application for disability and supplemental security income benefits. There are no records of Plaintiff returning to University Hospital for follow-up or treatment until September 23, 2003 – or approximately one month after the administrative hearing.

In the meantime, Plaintiff's counsel arranged a consultative examination for Plaintiff with a psychologist (Dr. Wiley Miller), which was conducted on August 1, 2003 – or, approximately three weeks before the administrative hearing. There is no indication that Dr. Miller had access to Plaintiff's medical records; instead, he relied solely on Plaintiff's statements and the results of testing he administered during the visit to reach his conclusions. In providing her history, Plaintiff conceded to Dr. Miller that she was not always truthful or forthcoming when discussing her problems with her treating doctors. R. at 171. Plaintiff reported she was still receiving treatment (including prescriptions for Xanax and Tegretrol), even though the record reflects it had been almost a year since her last visit and her prescriptions were not valid for more than a month or two.

Dr. Miller administered the Minnesota Mulitphasic Personality Inventory ("MMPI"), which he described as resulting in a profile "largely . . . of extremes. . . . Such extreme scores raise serious concerns about the validity of the test results." He conceded the results initially suggested Plaintiff "might have been malingering or attempting to appear to be more . . . . severely psychologically disturbed than is actually true [but the] L scale

3

elevation suggests that the examinee was not attempting to 'look bad' on the test. To the contrary, the L scale suggests that she might have been attempting to appear to be somewhat better than is actually the case." R. at 172. Nonetheless, Dr. Miller decided Plaintiff's scores were "acceptably valid" so long as one took "into account that her high scores are just a bit higher, and her low score[s] just a bit lower, than they should properly be perceived as being." R. at 173. He ultimately concluded Plaintiff suffers from Bipolar Disorder with manic and psychotic features in partial remission. This condition manifests itself in "substantial levels of both anxiety and depression." He recommended Plaintiff continue psychiatric and psychological treatment even though she was "not likely to experience substantial improvement as a consequence of treatment." R. at 177.

Dr. Miller completed a form entitled "Medical Assessment of Ability to Do Work-Related Activities (Mental)." He indicated Plaintiff had poor or no ability to deal with the public, exercise judgment, function independently, behave in an emotionally stable manner, or demonstrate reliability, and only fair ability to interact with supervisors, deal with stress at work, or function independently. R. at 166-67.

As indicated above, the record indicates Plaintiff returned to University Hospital on September 23, 2003.[2] She reported "doing good" on Tegretol and Xanax and received prescriptions for those medications. R. at 156. She came back one week later, reported that she "didn't connect" with the doctor she saw the previous week and that the medicine was not helpful. She was given another prescripton for Xanax and one for Loxitane. R. at 157.

In November 1993, the Missouri Division of Disability Determinations arranged for Plaintiff to undergo another consultative examination with a psychologist (Dr. Russel Newton). Plaintiff reported that she had been prescribed Tegretol and Xanax, but had not taken her medication that day. R. at 159. Dr. Newton administered the MMPI and

---

[2]Plaintiff may have sought treatment at University Hospital between October 2002 and September 2003, but there are no records of such visits.

4

noted differences between the scores he obtained and those obtained by Dr. Miller. Dr. Newton offered this explanation for the differences:

> All elevations [on the test administered by Dr. Miller] except depression were massively reduced as of my assessment. This sort of confusion and suspiciousness is typical of addictions and potentially the result of addiction/withdrawal, which was minimally discussed at that time. Conceivably the claimant was simply not forthcoming about the amount of Xanax. She did report both Tegretol and Xanax. Claimant did allege not being forthcoming to Dr. Miller. Her preference for Xanax is documented in the medical record.

R. at 162. He concluded Plaintiff required treatment with an antidepressants instead of anti-anxiety medication; in fact, he indicated Plaintiff needed to begin decreasing her use of Xanax because its overuse or abuse was likely causing her mood changes. He predicted Plaintiff's disability would last for at least a year but had "major potential to respond to appropriate treatment." R. at 162. Finally, Dr. Newton completed a Medical Source Statement - Mental indicating Plaintiff is markedly limited in her ability to carry out detailed instructions but only moderately limited in her ability to understand and remember detailed instructions, carry out simple instructions, make simple work-related decisions, interact with the public, supervisors and co-workers, and respond to work pressures and changes in routine. R. at 164-65.

During the hearing, Plaintiff testified she is disabled because she is "very nervous, very irritable, and [has] problems with being around other people [and cannot] get along with them." R. at 267. She also testified that she suffers from panic attacks that occur approximately twice a week and last an entire day. R. at 273-74. She also experiences fits of depression that cause her to stay away from other people. R. at 274. Plaintiff also testified that she does not sleep well, as she gets only four to five hours of sleep a night. R. at 274-75.

The ALJ obtained testimony from a vocational expert ("VE"). The VE was asked to assume an individual with Plaintiff's age, education, and work experience who was restricted to work that was low stress, simple, repetitive, and required less than occasional interaction with supervisors, coworkers or the public. The VE testified that

5

such an individual could not return to their past work, but could perform work as an assembler, cleaner, or packager. R. at 276-77. In response to a follow-up questioning, the VE testified that an inability to adhere to a schedule or attend work on a reliable basis would preclude all work. R. at 277.

The ALJ found Plaintiff's credibility was affected negatively by her failure to be forthcoming with her doctors. In particular, he noted her failure to report her past problems with Xanax "greatly detracts from [Plaintiff's] credibility." R. at 14. He also noted that nothing in her treating physicians' reports indicated she was limited in the manner she described. The ALJ discounted Dr. Miller's opinions because they were internally inconsistent: he indicated she was in partial remission despite a lack of treatment, thereby suggesting her limitations were not as severe as he indicated. R. at 14. More importantly, Dr. Miller relied exclusively on Plaintiff's statements in evaluating her – and Plaintiff admitted to Dr. Newton she was not candid with Dr. Miller. Critically, Plaintiff made no mention of her addiction or past use of Xanax. Dr. Newton observed Plaintiff's addiction to Xanax and her need to be on anti-depressant medication as opposed to anti-anxiety medication, but the ALJ discounted Dr. Newton's opinions regarding her limitations because they were inconsistent with his observations as well as the reports of Plaintiff's treating doctors. R. at 15. The ALJ concluded Plaintiff's anxiety and depression could be controlled medically and that some of her problems are related to her drug abuse (particularly Xanax). The ALJ concluded Plaintiff has the ability to work except that she must work in a job that requires less than occasional interaction with other people and involves low-stress, simple and repetitive duties. Based on the VE's testimony, the ALJ concluded Plaintiff can perform work that exists in significant numbers in the national economy.

## II. DISCUSSION

"[R]eview of the Secretary's decision [is limited] to a determination whether the decision is supported by substantial evidence on the record as a whole. Substantial evidence is evidence which reasonable minds would accept as adequate to support the

6

Secretary's conclusion. [The Court] will not reverse a decision simply because some evidence may support the opposite conclusion." Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994) (citations omitted). Though advantageous to the Commissioner, this standard also requires that the Court consider evidence that fairly detracts from the final decision. Forsythe v. Sullivan, 926 F.2d 774, 775 (8th Cir. 1991) (citing Hutsell v. Sullivan, 892 F.2d 747, 749 (8th Cir. 1989)). Substantial evidence means "more than a mere scintilla" of evidence; rather, it is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. Smith v. Schweiker, 728 F.2d 1158, 1161-62 (8th Cir. 1984).

Plaintiff's argument can be summarized thusly: the ALJ should have credited Dr. Miller's opinions over all Plaintiff's treating physicians because he saw Plaintiff most recently. This is not the law. A treating physician's opinion is preferred over a consulting physician's opinion because the treating physician has greater knowledge and history of the patient. A consultative opinion may have evidentiary value, but not in a case (such as this) where it is contrary to the remaining evidence in the record.

The record supports the ALJ's finding that Plaintiff has a long history of seeking, and abusing, Xanax. The record also reflects Plaintiff told her treating physicians the medication she was prescribed (including Xanax) alleviated her symptoms. Consequently, they continued prescribing Xanax, thereby either (1) fueling her addiction or (2) alleviating her problems, depending on whether one believes the reports Plaintiff made to her treating doctors. Plaintiff cannot obtain benefits for disabling conditions that are amenable to treatment or that are caused by abuse of drugs (legal or illegal). Consequently, Plaintiff is stuck in a dilemma. If, as she told her doctors, Xanax alleviated her problems, she is not entitled to benefits. If Xanax is not helpful, then she consistently lied to her doctors, thereby rendering her testimony unworthy of belief. If Xanax is actually the cause of her problems, then she is not entitled to benefits. Ultimately, the record simply does not reflect Plaintiff suffers from a mental impairment that imposes limitations greater than those found by the ALJ.

Finally, it must also be remembered Dr. Newton – a consulting psychologist – disagreed with many of Dr. Miller's conclusions. Thus, even if this case came down to a

7

simple choice between two consultants, the ALJ's decision to confer greater weight on Dr. Newton's opinions is justified by his greater access to Plaintiff's history and Plaintiff's concession that she was not forthcoming during Dr. Miller's examination.

### III. CONCLUSIONS

For these reasons, the Commissioner's final decision denying benefits is affirmed.

IT IS SO ORDERED.

                                        /s/ Ortrie D. Smith
                                        ORTRIE D. SMITH, JUDGE
DATE: February 1, 2006                UNITED STATES DISTRICT COURT

8

Case 2:05-cv-04128-ODS   Document 12   Filed 02/02/06   Page 8 of 8